IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
OHIO WESTERN DIVISION

| | | |
|---|---|---|
| DIANE FISHER, | ) | CASE NO. 3:18CV1708 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES G. CARR |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Diane Fisher ("Fisher") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

In March and September 2015, Fisher protectively filed her applications for DIB and SSI,

respectively, alleging a disability onset date of March 1, 2014.  Tr. 16.  She alleged disability

based on the following: heart attack, blood clots, obesity, and pain in her back and feet.  Tr. 271.

After denials by the state agency initially (Tr. 98, 99) and on reconsideration (Tr. 126, 127),

Fisher requested an administrative hearing.  Tr. 157.  A hearing was held before an

Administrative Law Judge ("ALJ") on August 1, 2017.  Tr. 33-65.  In his December 6, 2017,

decision (Tr. 16-27), the ALJ determined that there are jobs that exist in the national economy

that Fisher can perform, i.e., she is not disabled.  Tr. 26-27.  The Appeals Council denied

Fisher's request for review, making the ALJ's decision the final decision of the Commissioner.

Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Fisher was born in 1968 and was 45 years old on her alleged onset date.  Tr. 228.  She

has two years of college.  Tr. 40.  Previously, she worked as a bill collector and a telephone

solicitor.  Tr. 41-43, 59.  More recently, she worked part time as a breakfast attendant at a hotel

and as a massage therapist, a job she was still performing at the time of the hearing.  Tr. 41-44.

### B.  Relevant Medical Evidence[1]

On September 16, 2014, Fisher had right foot x-rays taken; they showed mild to moderate

diffuse degenerative features.  Tr. 734.

On April 1, 2015, Fisher reported heel pain in her left foot to her primary care physician,

John Coates, D.O.  Tr. 819.  She had complained of heel pain before and had been put on Motrin,

which was not helping.  Tr. 819.  Dr. Coates ordered an x-ray, prescribed prednisone, and

referred her to podiatry.  Tr. 820.  Fisher also complained of abdominal pain and hip pain.  Tr.

819, 821.  Dr. Coates gave her a note that read, "Please allow patient to reduce work days to 3

per week (@ 15 hours) due to medical condition."  Tr. 987.  The x-ray of her left foot showed a

plantar calcaneal heel spur.  Tr. 636.

On May 7, 2015, Fisher saw podiatrist Kristina Green, DPM, for left plantar heel pain.

Tr. 796.  Fisher reported that it had started three months prior and she "hasn't really done much

for the problem."  Tr. 796.  It was more painful after being on her feet all day at work; she would

---

[1] Fisher only challenges the ALJ's decision with respect to her foot impairment.  Doc. 22, pp. 2, 9-18.  Thus, only the medical evidence that relates to this impairment is summarized and discussed herein.

limp by the end of the workday.  Tr. 796.  She had been icing it and stretching it per Dr. Coates'
instructions but it was not helping.  Tr. 796.  Upon exam, she had normal deep tendon reflexes
and pulses, capillary refill of less than three seconds, no edema, 5/5 muscle strength, intact
sensation, and pain with palpation of the left plantar heel spur at the insertion of the plantar
fascia.  Tr. 796.  X-rays were taken and showed a significant flat foot deformity and a mild
plantar calcaneal exostosis.  Tr. 796.  She was diagnosed with left foot plantar fasciitis with pain
and plantar calcaneal exostosis.  Tr. 796.  Dr. Green recommended rest, ice, stretches,
appropriate shoes, shoe inserts, possibly molded orthotics, and physical therapy.  Tr. 796.

Fisher returned to Dr. Green on September 17, 2015.  Tr. 796.  She had started physical
therapy in early August, had gone six times, and reported that it "wasn't really working."  Tr.
796.  She had gotten inserts but she only wore them when she was at work; otherwise, she wore
flip flops.  Tr. 796.  Upon exam, she had tenderness to palpation on her left plantar fascial heel.
Tr. 796.  Dr. Green recommended she wear her inserts on a more regular basis and use anti-
inflammatories.  Tr. 796.  She also discussed more aggressive treatment, such as cortisone
injections.  Tr. 796.

On February 3, 2016, Fisher saw podiatrist Khase Wilkinson, DPM, on referral from Dr.
Green for her left heel pain.  Tr. 1037.  Prior treatments included a controlled ankle movement
walking boot ("CAM walker") for 12 weeks, an injection, over-the-counter inserts, Advil, and
decreased work hours.  Tr. 1037.  She characterized her pain as severe, rated it 7/10, and stated
that she experienced it after periods of rest and when on her feet for long periods of time.  Tr.
1037.  Upon exam, she had an abnormal gait, pain upon palpation of the left central and medial
calcaneal tubercle, no pain with squeeze of the heel, normal bilateral medial longitudinal arch,
abnormal left ankle range of motion (due to tight left gastroc-soleus complex), and no edema.

3

Tr. 1038.  Dr. Wilkinson assessed left plantar fasciitis, enthesopathy of the ankle and tarsus, and neuritis of the left foot.  Tr. 1038.  Based on her extensive conservative treatment, Dr. Wilkinson recommended Fisher have an endoscopic plantar fasciotomy and fitted her for molded orthotics. Tr. 1039.

On February 29, 2016, Dr. Wilkinson performed a left endoscopic plantar fasciotomy and placed Fisher in a cast boot.  Tr. 1118-1119.  At her two-week post-operative visit on March 14, Fisher reported a pain level of two, mild pain at the incision cite, and no pain at the medial heel. Tr. 1082.  Dr. Wilkinson stressed the importance of wearing her orthotics, continuing to stretch and ice, wearing the night splint, gradually increasing activities, and warned her of the complications associated with doing too much and barefoot walking.  Tr. 1083.

On April 11, at her five-week post-operative visit, Fisher reported considerable pain, but also reported having gone on a shopping trip to Columbus.  Tr. 1088.  Dr. Wilkinson indicated that she had probably been doing too much and noted that she had not been icing or stretching and she had been walking barefoot.  Tr. 1088.  She reported that she could walk for about one hour "before she feels a ball on the bottom of her foot near the surgery site." Tr. 1088.  Upon exam, she had no pain at the medial heel.  Tr. 1088.  Dr. Wilkinson again stressed the importance of wearing her orthotics, stretching, icing, wearing her night boot, and gradually increasing activity, and warned of the complications of too much walking and barefoot walking.  Tr. 1089.

At a follow up on May 9, 2016, Fisher reported that she was getting a little bit better.  Tr. 1095.  She was wearing her orthotics, having less pain, and could walk for about one hour before experiencing pain on the bottom of her foot.  Tr. 1095.  Dr. Wilkinson prescribed physical therapy.  Tr. 1095.

On June 9, 2016, Fisher reported that she was getting better and could walk more than

one hour before feeling pain.  Tr. 1100.  Dr. Wilkinson placed a work restriction of one shift per week.  Tr. 1101.

On July 14, 2016 Fisher reported that physical therapy had not helped and that she had to stop due to pain. Tr. 1106.  Dr. Wilkinson assessed her as gradually improving.  Tr. 1107.

On September 8, 2016, Fisher reported that she was still having pain but was better after rest.  Tr. 1112.  Her back was now hurting.  Tr. 1112.  Dr. Wilkinson assessed her as gradually improving and placed her on restrictions of two shifts per week, noting that, if her pain returns, she should reduce it to one shift per week.  Tr. 1113.

On February 23, 2017, Fisher followed up with Dr. Wilkinson.  Tr. 1337.  She still had some pain but was better with rest.  Tr. 1337.  She had a new job as a massage therapist and her heel would be sore when she was on her feet for long periods of time.  Tr. 1337.  Upon exam, she had no edema, normal muscle strength, no structural deformities, and no pain upon palpation. Tr. 1337.  Dr. Wilkinson placed her on a work restriction of 8-12 hours a week until August.  Tr. 1338, 1340.

### C. Opinion Evidence

#### 1. Treating source

On September 23, 2015, and October 6, 2015, Dr. Green opined that Fisher must work no more than 15 hours per week due to left foot pain.  Tr. 792-794, 985.  On October 29, 2015, Dr. Green wrote a work restriction stating, "Please allow [Fisher] to limit her work days to 2 days/week until further notice due to left foot pain and possible stress [fracture]."  Tr. 984.  On January 5, 2016, Dr. Green wrote a work restriction that Fisher be permitted to limit her work to two days a week due to left foot pain.  Tr. 983.

On May 9, 2016, Dr. Wilkinson opined that Fisher could return to work beginning June

13 with one shift per week until further notice.  Tr. 1055.  On September 8, 2016, he indicated she could work two shifts per week.  1338-1340.  On February 23, 2017, Dr. Wilkinson placed her on a work restriction of 8-12 hours a week until August.  Tr. 1338, 1340.

### 2. State Agency Reviewers

On December 12, 2015, state agency reviewing physician Teresita Cruz, M.D., reviewed Fisher's record and opined that she was capable of performing light work with postural restrictions.  Tr. 77-79.  On March 16, 2016, state agency reviewing physician Lynne Torello, M.D., agreed that Fisher could perform light work with postural restrictions.  Tr. 121-123.

### D.  Testimonial Evidence

### 1.  Fisher's Testimony

Fisher was represented by counsel and testified at the administrative hearing.  Tr. 35. Fisher stated that she currently worked 12 hours a week as a massage therapist.  Tr. 45.  When asked why she could not work longer, Fisher stated, "Not reinjuring myself."  Tr. 45.  She explained that when she is working on a client she is sitting down part of the time and standing up part of the time and that she has to be careful when she massages the client's back.  Tr. 45. Her movements when massaging are very critical to her back not going out on her and being on her feet for too long.  Tr. 45.  She has pain in her low back that is treated by injections and nerve ablation.  Tr. 45-46.  She has had back problems since she began doing massage therapy in 2012. Tr. 46.  She started getting back injections about a year ago, after her foot surgery.  Tr. 46.  She fell in a grocery store and that probably aggravated her back.  Tr. 46.

Fisher stated that she had plantar fasciitis and osteitis in her foot.  Tr. 46.  It began in early 2015, while she was working as a breakfast attendant.  Tr. 47.  She had surgery in February 2016.  Tr. 47.  Her progress after surgery was slow, "but that's the way the doctor said it would

be [], so I don't re-injure it." Tr. 47.  After the surgery she was walking right away but was limited due to a big boot she had on her leg.  Tr. 47.  She wore the boot for about a couple of months after surgery.  Tr. 47.  She can't remember how much time off she took from work after her surgery; maybe 12 weeks.  Tr. 48.  She had a lot of time off, a lot of reduced hours.  Tr. 48. Currently, her foot was better, but not completely.  Tr. 48.  She does not have "the extreme pain of it rubbing on my bone causing inflammation, but I still get the tearing feeling."  Tr. 48.  She still can't be on her foot for long.  Tr. 48.

When asked what other problems prevent her from working full time, Fisher stated that she has blood clots in her legs due to bad circulation and her legs swell up.  Tr. 48.  So, if she is sitting for a long period of time she has her legs propped up and she tries to keep her foot moving for circulation.  Tr. 48.  She had a blood clot in 2008 and has had no blood clots since then, but she has to be aware of what she does.  Tr. 49.  She also had a heart attack in 2014.  Tr. 50-51.

Fisher's attorney clarified that the record showed she had been off work after her foot surgery until June 2016, at which time she was restricted to one shift per week.  Tr. 50-51. Fisher stated that her shift as a breakfast attendant was five hours long.  Tr. 51.  When asked why she could perform her job as a massage therapist but could not perform her prior job as a breakfast attendant despite the fact that the shift hours are about the same, Fisher stated that the massage therapist job was more flexible.  Tr. 51.  Also, she can sit down for part of the massage. Tr. 51.  A shift as a massage therapist is two hours doing massages, a one-hour break, and then another two hours doing massages.  Tr. 52.  During her break, she sits down with her feet up to reduce the swelling in her leg and ankle and gives her back and foot a break.  Tr. 52.

Fisher can sit for about 20 minutes before needing to stand up again because her back hurts.  Tr. 53.  She can stand in one place for about 15 minutes before she needs to sit or move

around because things will start to lock up in her back.  Tr. 54.  She can be on her feet about 30 minutes and then she wants to put her foot up so she doesn't have swelling.  Tr. 54.  She can lift and carry one gallon of milk but not two.  Tr. 55.  She can cook with no problem.  Tr. 55. Cleaning is a shared project (Fisher lives with her adult daughter in an apartment), but if she does the cleaning she will usually end up in the ER because of overdoing it.  Tr. 55, 56.  Things that aggravate her are sweeping, bending, and dusting.  Tr. 55.  She will go to the grocery store but she has to limit what she brings home if there is no one to help her empty the car.  Tr. 56.

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 57-64.  The ALJ asked the VE to determine whether a hypothetical individual of Fisher's age, education and work experience could perform her past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform Fisher's past work as a bill collector and telephone solicitor.  Tr. 59-60.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his December 6, 2017, decision, the ALJ made the following findings:

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2019.  Tr. 18.

2. The claimant has not engaged in substantial gainful activity since March 1, 2014, the alleged onset date.  Tr. 18.

3. The claimant has the following severe impairments: degenerative disc disease, plantar fasciitis, and obesity.  Tr. 18.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 19.

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl.  She can never climb ladders, ropes, or scaffolds, and frequently balance.  She must avoid concentrated exposure to extreme heat and cold.  Finally, she can never be exposed to hazardous machinery, unprotected heights, or commercial driving.  Tr. 20.

6. The claimant is capable of performing past relevant work as a bill collector and telephone solicitor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  Tr. 26.

7. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2014, through the date of this decision.  Tr. 27.

## V. Plaintiff's Arguments

Fisher challenges the ALJ's decision on two grounds: (1) reversal is warranted because the ALJ was not properly appointed, relying on *Lucia v. Securities & Exchange Comm'n*, 138 S.Ct. 2044 (2018), and (2) the ALJ erred when she failed to recognize that Fisher is unable to work more than 12 hours a week.  Doc. 22, pp. 11-18.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. Fisher has forfeited her Appointments Clause challenge

#### 1. Fisher forfeited her Appointments Clause challenge

Fisher argues that the ALJ who decided her case was not properly appointed, relying on the recent Supreme Court decision *Lucia v. Securities & Exchange Commission*, 138 S.Ct. 2044 (2018).  She asserts that her case should be remanded and assigned to a new ALJ to decide her case.  Doc. 22, pp. 1, 11-17, 19.

In *Lucia*, the United States Supreme Court held that Securities and Exchange Commission administrative law judges are inferior officers who must be appointed pursuant to the Appointments Clause of the U.S. Constitution;[3] because the administrative law judge in that case had not been so appointed, the plaintiff was entitled to a new hearing by a new and properly appointed administrative law judge.  138 S.Ct. at 2055.  *Lucia* did not address whether Social Security administrative law judges are inferior officers who also must be appointed pursuant to the Appointments Clause.

Defendant does not contest that the Social Security administrative law judges are inferior

---

[3]  The Appointments Clause provides, "only the President, 'Courts of Law,' or 'Heads of Departments' can appoint 'Officers.'"  *Lucia*, 138 S.Ct. at 2050 (quoting Const. Art. II, § 2, cl. 2).

officers who must be appointed pursuant to the Appointments Clause and that the ALJ in this

case was not so appointed.  Doc. 21, pp. 8-16.  Rather, Defendant submits that *Lucia* emphasized

that "one who makes a *timely* challenge to the constitutional validity of the appointment of an

officer who adjudicates his case" is entitled to relief.  Doc. 21, p. 8 (citing *Lucia*, 138 S.Ct. at

2055, in turn citing *Ryder v. United States*, 515 U.S. 177 (1995) (emphasis added by

Defendant)).  Defendant asserts that, because Fisher never challenged the ALJ's appointment at

any time during the administrative proceedings below, she failed to make a timely challenge and

has forfeited her Appointments Clause claim.  Doc. 21, p. 8.

Fisher contends that, per *Sims v. Apfel*, 530 U.S. 103 (2000), she has not forfeited this

issue despite not raising it during her administrative proceeding.  Doc. 22, p. 12.  In *Sims*, the

United State Supreme Court held that a social security claimant need not exhaust all issues

before the Social Security Appeals Council in order to preserve the claimant's right to judicial

review of those issues.  The issues that Sims challenged were the various ways in which she

believed the ALJ erred when analyzing the evidence in her case.  530 U.S. at 105.  *Sims* left

undecided whether a Social Security claimant must raise an issue before the ALJ deciding her

case in order to preserve the issue for judicial review.  *Id*. at 107 ("[w]hether a claimant must

exhaust issues before the ALJ is not before us.").

Most courts that have addressed the arguments advanced by Fisher have found that a

failure to challenge the propriety of an ALJ's appointment at any time during the administrative

process results in a claimant's forfeiture of that challenge.  *See, e.g., Wreede v. Comm'r of Soc.

Sec*., 2019 WL 1324024, at *21-22 (N.D.Ohio March 25, 2019) (*adopting Report &

Recommendation*); *Page v. Comm'r of Soc. Sec*., 344 F.Supp.3d 902 (E.D. Mich. 2018);

*Hutchins v. Berryhill*, --F.Supp.3d--, 2019 WL 1353955 (E.D. Mich. March 26, 2019) (*rejecting

*Report & Recommendation*); *Flack v. Comm'r of Soc. Sec.*, 2019 WL 1236097 (S.D.Ohio March 18, 2019) (*adopting Report & Recommendation*); *Faulkner v. Comm'r of Soc. Sec.*, 2018 WL 6059403 (W.D. Tenn. Nov. 19, 2018).[4]  The undersigned finds the reasoning in those cases sound and adopts their conclusion: a party who fails to raise an Appointments Clause challenge during any part of the administrative process has forfeited that challenge.  *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring) ("To abandon th[e] principle [of forfeiture] is to encourage the practice of "sandbagging": suggesting or permitting, for strategic reasons, that the trial court pursue a certain course, and later—if the outcome is unfavorable—claiming that the course followed was reversible error.").

The undersigned also observes that, in *Sims*, the issues the claimant failed to raise before the Appeals Council were that the ALJ's question to the VE was defective and that the ALJ should have ordered a consultative examination.  *Id.* at 105-106.  In determining that the doctrine of administrative issue exhaustion would not preclude the claimant from raising these claims on judicial review despite not raising them to the Appeals Council, the Court explained,

> Where the parties are expected to develop the issues in an adversarial administrative proceeding, it seems to us that the rationale for requiring issue exhaustion is at its greatest....Where, by contrast, an administrative proceeding is not adversarial, we think the reasons for a court to require issue exhaustion are much weaker.

*Id.* at 110.

While it is true that Social Security disability proceedings are more inquisitive than

---

[4] *See also Stewart v. Berryhill*, 2019 WL 772334, at *8 (E.D.N.C. Feb. 20, 2019); *V. v. Berryhill*, 2019 WL 568349, at *2 (D. Minn. Feb. 12, 2019); *Byrd v. Berryhill*, 2019 WL 95461, at *6 n.10 (E.D. Cal. Jan. 3, 2019); *Velasquez o/b/o Velasquez v. Berryhill*, 2018 WL 6920457 (E.D. La. Dec. 17, 2018), report and recommendation adopted, 2019 WL 77248 (E.D. La. Jan. 2, 2019); Abbington v. Berryhill, 2018 WL 6571208, at *9 (S.D. Ala. Dec. 13, 2018); *Nickum v. Berryhill*, 2018 WL 6436091, at *5-6 (D. Kan. Dec. 7, 2018); *Garrison v. Berryhill*, 2018 WL 4924554, at *2 (W.D.N.C. Oct. 10, 2018); *Williams v. Berryhill*, 2018 WL 4677785, at *2-3 (S.D. Miss. Sept. 28, 2018); *Davidson v. Comm'r of Soc. Sec.*, 2018 WL 4680327, at *2 (M.D. Tenn. Sept. 28, 2018); *Stearns v. Berryhill*, 2018 WL 4380984, at *5-6 (N.D. Iowa Sept. 14, 2018); *Hugues v. Berryhill*, 2018 WL 3239835, at *2 n.2 (C.D. Cal. July 2, 2018).

adversarial in nature, a claimant's challenge to the propriety of an ALJ's appointment under the Appointments Clause is not.  As the plurality opinion in *Sims* observed, the Appeals Council is expected to review all parts of the ALJ's decision and the appeals form suggests that the Appeals Council does not depend upon the claimant to identify the issues to review, i.e., it is inquisitive in nature and requiring issue exhaustion is at its weakest.  *Id*. at 112 (plurality opinion). However, the Appeals Council cannot reasonably be expected to raise *sua sponte* challenges to the Social Security Administration's compliance with the Appointments Clause.  With respect to such a challenge, the rationale for requiring issue exhaustion by a claimant is at its strongest.  *See id*.

In short, Fisher has forfeited her Appointments Clause challenge.

### 2. Fisher's forfeiture is not excused

Fisher argues that her forfeiture should be excused because exhaustion would be futile. Doc. 22, p. 15.  She asserts that, while her claim was pending before the Appeals Council, the Social Security Administration's Office of General Counsel issued an Emergency Message instructing ALJs, if faced with an Appointments Clause challenge, to declare that they do not have authority to rule on that challenge and will not address it further, and instructing the Appeals Council to not "acknowledge, make findings related to, or otherwise discuss" the issue. Doc. 22, p. 16; Doc. 22-1.  However, Fisher does not dispute that she did not raise this issue at any time during her administrative proceedings and her expectation that the agency would respond in accordance with the instructions given by its General Counsel does not excuse the requirement that she raise the issue at the administrative level.  *See, e.g., United States v. L.A. Tucker Truck Lines, Inc*., 344 U.S. 33, 37 (1952) (claimant's challenge to the appointment of the Interstate Commerce Commission's examiner required exhaustion during the administrative

14

proceedings, notwithstanding the claimant's assertion that the Commission had a predetermined policy instructing such a challenge be overruled).  Accordingly, Fisher's failure to raise an Appointment Clause challenge is not excused.  *C.f., e.g., Jones Brothers, Inc. v. Sec. of Labor, Mine Safety, & Health Admin.*, 898 F.3d 669, 677-678 (6th Cir. 2018) (excusing a plaintiff's forfeiture of Appointments Clause challenge because the plaintiff, while not "press[ing]" the issue before the Mine Commission, did raise the issue).

The undersigned recommends the Court find that Fisher has forfeited her Appointments Clause challenge and her forfeiture is not excused.

### B. The ALJ did not err with respect to Fisher's assertion that she is unable to work more than 12 hours a week

Fisher argues that the ALJ erred when he found she can work more than 12 hours a week. Doc. 22, p. 17.  She alleges that her inability to work more than 12 hours a week is supported by substantial evidence.  Doc. 22, p. 17.  The substantial evidence she cites to in support of her argument are the opinions of her treating podiatrists, Drs. Green and Wilkinson.  Doc. 22, pp. 17-18.  Fisher does not challenge the ALJ's credibility assessment; rather, she challenges the ALJ's assessment of these treating source opinions.

To consider Fisher's argument, the undersigned first evaluates whether the opinions of Drs. Green and Wilkinson support her assertion that she is unable to work more than 12 hours a week, and then considers whether the ALJ violated the treating physician rule when assigning "little" weight to the opinions of Drs. Green and Wilkinson.

### 1. The podiatrists' opinions do not support a finding that Fisher can work no more than 12 hours a week

At the time of the hearing, Fisher was working as a massage therapist for 12 hours a week.  Tr. 44-45.  She testified that she could not work more than 12 hours a week for a variety

of reasons: her foot (she cannot be on her foot for long periods of time); her back (she must be able to sit/stand and move around); and her history of blood clots and edema in her legs (she must sit and prop her legs up and move around to help her circulation).  Tr. 45, 48, 51, 52.

But Drs. Green and Wilkinson are podiatrists.  Fisher saw them for her foot pain.  They diagnosed her with plantar fasciitis in her left foot and treated her.  They were not treating her back pain or her leg edema.  They were not expressing opinions about how many hours a week Fisher could perform any kind of work.  Rather, they were expressing opinions about the amount of time Fisher could be on her feet at her then-current jobs: breakfast attendant and massage therapist.

Collectively, the doctors issued eight opinions from April 1, 2015, to September 8, 2016; these opinions simply stated what Fisher's current work restrictions were.[5]  During this time period Fisher was working 5-hour shifts as a breakfast attendant at a hotel, work that required her to be on her feet.  Tr. 43-45.  Drs. Green and Wilkinson opined how many hours Fisher could work—three days per week; "reduced hours"; 15 hours per week; two days a week; no work; one shift per week; and two shifts per week.[6]  Tr. 25.  While these opinions limited Fisher's work hours, it was within the context of her then-current job that required her to be on her feet for a 5-hour shift per day.

At the time of the last opinion in the record, Dr. Wilkinson's February 3, 2017, work restriction that limited Fisher to no more than 12 hours per week for the next six months, Fisher was working as a massage therapist no more than 12 hours per week.  Tr. 44-45.  Here again, Dr. Wilkinson's opinion is compatible with Fisher's then-current work schedule and reflects the fact

---

[5] The ALJ stated that Dr. Green wrote notes on April 1 and September 15, 2015 (Tr. 25), but it appears that these notes were written by Dr. Coates.  Tr. 986-987.

[6] Because Fisher worked a 5-hour shift per day at this job, a restriction of working no more than three days a week is the same as a restriction of working no more than 15 hours a week.  Dr. Wilkinson's further reduction of permitted work hours—no hours, then one or two days/shifts per week—occurred after Fisher had foot surgery.

that she spent a good deal of time on her feet when performing this job.

In sum, the work restrictions set forth by podiatrists Drs. Green and Wilkinson regarding the amount of time Fisher could perform her then-current jobs do not support Fisher's assertion that she is unable to perform any work more than 12 hours per week.

### 2. The ALJ did violate the treating physician rule with respect to some of Dr. Green's opinions but that error is harmless

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ assessed "little" weight to the opinions of Drs. Green and Wilkinson.  He found that four of Dr. Green's six opinions (limiting Fisher to no more than 15 hours per week) were "without substantial support from *any* objective clinical or diagnostic findings[.]"  Tr. 25 (emphasis added).  But there were clinical and diagnostic findings to support Dr. Green's opinions: Fisher had abnormal foot x-rays and was found, upon exam, to have pain with palpation.  These are objective clinical and diagnostic findings.  Thus, the ALJ's statement was

17

inaccurate and, therefore, not supported by substantial evidence.

As for the remaining two opinions of Dr. Green, dated October 29, 2015, and January 5, 2016, the ALJ observed that the last treatment note in the record from Dr. Green was in September 2015.  Tr. 25.  This is a proper basis for discounting the later opinions of Dr. Green.  *See Ramsey v. Comm'r of Soc. Sec.*, 2018 WL 656029, at *7 (N.D.Ohio Feb. 1, 2018) (an ALJ properly considers contemporaneous treatment notes when assessing a treating source opinion, citing *Price v. Comm'r of Soc. Sec.*, 342 Fed. App'x 172, 177 (6th Cir. 2009)).

The ALJ gave "little weight" to Dr. Wilkinson's opinions (Fisher could work one or two shifts per week) for all of the following reasons: they were conclusory; Dr. Wilkinson did not explain the evidence he relied on to form his opinion; he did not document positive clinical or diagnostic findings to support his opinion; he did not do a function-by-function analysis of work-related abilities; and the restriction contained in the opinion was for a limited duration (six months).  Tr. 25.  The ALJ's complaint that Dr. Wilkinson did not document the evidence he relied on is questionable; although it is true that Dr. Wilkinson did not document the evidence he relied on, his assessed work restrictions were contemporaneous to Fisher's foot surgery and her recovery and thus may reasonably be assumed to be related.  However, the ALJ's reasoning that the restriction reflected in Dr. Wilkinson's opinions was for a limited duration is sound; and is a reasonable basis for discounting Dr. Wilkinson's opinion.  *See, e.g., Fellows v. Comm'r of Soc. Sec.*, 2017 WL 3473842, at *5 (W.D. Mich. Aug. 14, 2017) (ALJ did not err when assigning little weight to treating physician' temporary work restrictions because the restrictions were not permanent).

In any event, any error the ALJ may have committed when assigning "little" weight to the opinions of Drs. Green and Wilkinson is harmless.  A violation of the treating physician rule

may be harmless error if (1) a treating source's opinion "is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. Defendant asserts, without further articulation, that any treating physician rule violation is harmless based on the third example, that the ALJ met the goal of the procedural safeguard. Doc. 21, p. 20, n. 7.  The undersigned disagrees that the third example of harmless error is satisfied but finds that the second example of harmless error is satisfied.

The ALJ found that Fisher was capable of performing work at the sedentary exertional level.  Tr. 20.  Sedentary work requires standing or walking occasionally, i.e., no more than two hours in an 8-hour day.  20 C.F.R. § 404.1567(a); SSR 83-10, 1983 WL 31251, at *5 ("Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday[.]").  Generally, Drs. Green and Wilkinson provided work restrictions limiting Fisher to 12 to 15 hours a week.  As explained above, the podiatrists did not opine that Fisher must not perform *any* work for more than 12 hours a week; they opined that she could not perform her then-current work for more than 12 or 15 hours a week due to her foot pain.  Thus, the ALJ's assessed RFC of sedentary work limits Fisher to being on her feet for no more than 10 hours a week, i.e., the ALJ's RFC assessment is more restrictive than the work restrictions Drs. Green and Wilkinson provided.  Because the ALJ's RFC is consistent with the opinions of Drs. Green and Wilkinson, any error the ALJ made with respect to the treating physician rule is harmless.  *See Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) (violation of the treating physician rule was

harmless when the ALJ's RFC was consistent with the opinion).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

Dated: May 24, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).